## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEXT/INGLE HOLDINGS, LLC, a Delaware limited liability company, and NEXT NRG OPS, LLC, f/k/a NEXTNRG, LLC, a Delaware limited liability company,<br><br>                              Plaintiffs,<br><br>          v.<br><br>GSPP HOLDCO III, LLC, a New York limited liability company and GREEN STREET POWER PARTNERS, LLC, a New York limited liability company,<br><br>                              Defendants. | Civil Action No. 1:25-cv-9836 |

## **COMPLAINT**

Plaintiffs, NEXT/INGLE HOLDINGS, LLC, a Delaware limited liability company ("**NIH**") and NEXT NRG OPS, LLC, f/k/a NEXT NRG, LLC, a Delaware limited  liability company ("**NextNRG**", collectively with NIH, "**Plaintiffs**"), through undersigned counsel, sue Defendants, GSPP HOLDCO III, LLC, a New York limited liability company ("**GHC III**") and GREEN STREET POWER PARTNERS, LLC, a New York limited liability company ("**GSPP**", collectively with GHC III, "**Defendants**"), and allege as follows:

## **PARTIES**

1.        NIH is a Delaware limited liability company with a principal place of business at 407 Lincoln Road, Ste 9F, Miami Beach Fl. 33139. For jurisdictional purposes, NIH is domiciled in the State of Florida.

2.      NextNRG is a Delaware limited liability company formerly known as NextNRG, LLC, with a principal place of business at 407 Lincoln Road, Suite 9F, Miami Beach, FL 33139. For jurisdictional purposes, NextNRG is domiciled in the State of Florida.

3.      GHC III is a New York limited liability company, with a principal place of business at 1 Landmark Square, Suite 320, Stamford, CT 06901.  For jurisdictional purposes, GHC III is domiciled in the State of Connecticut.

4.      GSPP is a New York limited liability company, with a principal place of business at 1 Landmark Square, Suite 320, Stamford, CT 06901.  For jurisdictional purposes, GSPP is domiciled in the State of Connecticut.

## JURISDICTION

5.      This Court has jurisdiction of this matter as the amount in controversy is greater than Seventy-Five Thousand Dollars ($75,000.00), exclusive of fees, interest and costs, and complete diversity exists between Plaintiffs on one hand and the Defendants on the other, pursuant to 28 U.S.C. §1332 (a) and pursuant to the venue provision in contained in the Membership Interest Purchase and Sale Agreements between GHC III and NIH dated December 23, 2024 (the "**MIPA**" attached hereto as Exhibit "1"). Id. at § 9.12; § 9.14.

## GENERAL ALLEGATIONS

6.      In 2024, NextNRG and GSPP entered into negotiations for NextNRG and/or its designee or affiliate company to purchase the membership shares in a single purpose company, which eventually was named GSPP JEA Ingle FL, LLC, a New York limited liability company (the "**Project Company**"), which owned the developments rights to a ground mounted solar energy project (the "**Project**") located in Ingle, Florida.

7.     During these negotiations NextNRG and GSPP entered into that certain Letter of Intent (the "**LOI**", attached hereto as <u>Exhibit "2"</u>), containing various terms, and evidencing that the underlying intent and basis for the transaction was the sale of electricity generated by the Project to JEA, Inc. ("**JEA**"), the community-owned electric utility company that served the area in which the Project was located, pursuant to a prospective Power Purchase Agreement ("**PPA**") between the Project Company and JEA.

8.     Pursuant to the LOI, NextNRG paid GSPP a refundable deposit of Fifty Thousand and 00/100 Dollars ($50,000.00) (the "**Deposit**") upon execution of the LOI, which "will be returned to Buyer if Buyer is not satisfied with its due diligence and/or the Parties do not enter into the MIPA and close on the acquisition."

9.     In fact, the LOI was predicated upon, and extensively references the then ongoing PPA discussions and negotiations between GSPP and JEA, and included prospective terms of a PPA, **including a PPA Rate of $49 per Megawatt** ("**MW**"), as "Project Assumptions" contained in Appendix A to the LOI. <u>Id</u>. at § H; Appendix A.

10.    The LOI also required GSPP to provide NextNRG with a "Draft Redlined PPA" at closing of the contemplated transaction. <u>Id</u>. at § E (3).

11.    The LOI also included confidentiality provisions that explicitly precluded NextNRG from contacting JEA directly about the Project and the prospective PPA, and required GSPP to keep NextNRG apprised of its communications with JEA regarding the same, as follows:

> For clarity, consistent with the requirements of Section H. Confidentiality of this agreement, **Buyer shall not have any direct contact or communication with JEA or the site landlord or represent itself as a potential Buyer of the project to JEA or the site landlord**. Any communication with such third party during the period of exclusivity will only take place between such third party and the Seller, and National Solar with the prior approval of the Seller.

> **During the period of exclusivity the Seller, through National Solar, will keep the Buyer up to date regarding all communications with JEA to specifically include information related to any PPA discussions**.

Id. at § B (emphasis added).

12.     Section I of the LOI (entitled "Nature of the Agreement") also expressly excluded the Exclusivity and Confidentiality sections contained therein from the non-binding and exculpatory language which governed the remainder of the LOI, so that this provision constituted a free-standing, binding agreement separate and apart from the Membership Interest Purchase Agreement contemplated in the LOI, as follows:

> I.     Nature of this Agreement:
> **Except for sections B. Exclusivity and H. Confidentiality of this Agreement,** this LOI i) does not constitute a binding obligation on either Party; ii) may not contain all matters upon which agreement must be reached for the transaction to be consummated; and iii) creates no rights in favor of either Party (except with respect to the Exclusivity Period). All of the information that the Buyer is relying upon in making this transaction has been supplied by the project developer, National Solar. The Seller shall not be liable for any errors or omissions. Neither Party shall be liable for any damages of any nature, other than actual damages, for any reason, including without limitation the breach of this LOI, any termination of this LOI, or whether such liability is asserted on the basis of contract, tort (including negligence or strict liability) or otherwise, even if the Party has been advised of the possibility of such damages. In no event shall either Party be liable for lost profits or lost business opportunities arising out of this LOI. A binding commitment with respect to the proposed transaction will result only upon the execution of a MIPA signed by each Party.

Id. at § I (emphasis added).

13.     Further, representatives of GSPP represented to representatives of NextNRG that JEA would permit the Project to access existing JEA easements for a "gen-tie" line which would allow the Project to be connected to existing JEA infrastructure to facilitate transmission of

electricity to JEA, which representation the LOI expressly confirmed by providing that "substation infrastructure is available for the project to connect." Id. at § A (5).

14.     Thereafter, pursuant to the LOI, GSPP and NextNRG proceeded to negotiate a Membership Interest Purchase Agreement, during which time GSPP did not provide any update to NextNRG that JEA had communicated to them that the "Project Assumptions" contained in and underlying the PPA, including the PPA Rate and the existence of connection infrastructure in the form of access to JEA easement(s) for the "gen-tie" line expressly represented to exist in the LOI, had changed or were otherwise unacceptable to JEA or unrealistic.

15.     In fact, on or about December 16, 2024, approximately one (1) week prior to closing on the purchase of the Project pursuant to the MIPA, Jim Kreidler ("**Kreidler**"), a representative of GSPP spoke with James Scrivener ("**Scrivener**"), a representative of the Plaintiffs, and informed Scrivener that Kreidler had spoken with Pedro Melendez, Vice President of Planning, Engineering, & Construction at JEA, and that Mr. Melendez had informed him that *JEA was ready to move ahead with a PPA Rate of $49 per MW for energy and that JEA was also ready to include a "gen-tie" line in their easement(s)* (*e.g.*, the same "Project Assumption" terms stated in Appendix A to the LOI).

16.     On or about December 23, 2024, in reliance upon (i) the representations contained in the LOI, (ii) the representations concerning the status of the Project and the PPA communicated by representatives of GSPP to representatives of NextNRG, and/or (iii) critical information otherwise omitted by representatives of GSPP, NIH (as the designee or affiliate of NextNRG that served as the Buyer pursuant to the LOI) entered into the MIPA with GHC III (as the designee or affiliate of GSPP that served as the Seller pursuant to the LOI).

17.    Pursuant to the MIPA, NIH paid GHC III a total of Four Million One Hundred Thousand and 00/100 Dollars ($4,100,000.00), inclusive of (i) a purchase price of Three Million Six Hundred Thousand and 00/100 Dollars ($3,600,000.00) (the "**Purchase Price**"), including the Deposit NextNRG already had paid GSPP pursuant to the LOI, and (ii) Five Hundred Thousand and 00/100 Dollars ($500,000.00) in development costs ("**Seller's Development Costs**") (Ex. 1 at § 2.2) in consideration for the transfer to NIH of 100% of the legal and beneficial voting and economic ownership interests owned by GHC III in the Project Company, which in turn owned the development rights to the Project. See generally Ex. 1.

18.    The MIPA expressly defined the term the "Transaction Documents" to mean "this Agreement [the MIPA], the Assignment and Assumption Agreement, the assignment and assumption of the Development Services Agreement, **and all other agreements, certificates and other documents between Buyer and Seller or their Affiliates entered into pursuant to the terms hereof in order to carry out the Transactions.**" Id. at § 1.1 (emphasis added).

19.    Pursuant to Section 6.1 of the MIPA (captioned "Seller's Agreement to Indemnify"), GHC III also agreed to "indemnify, defend, reimburse, and hold harmless" NIH, as "Buyer", and its "directors, officers, employees, Affiliates (including, after the Closing, the Project Company), Controlling persons, agents and representatives and their respective successors and permitted assigns" from and against any and all "Losses" incurred by them from:

    a.    **the breach or inaccuracy of any representation or warranty made by Seller in any Transaction Document;**

    b.    **the breach of, or default under, any covenant or agreement of Seller contained in any Transaction Document**;

    c.    Claims brought against the Project Company or Buyer by Persons who were officers, members, directors or managers of a Project Company prior to the Effective Date arising from such Person's role as officer, member, director or manager;

    d.   any (i) Taxes of, or with respect to the Project Company or any Project Assets for the tax period prior to the Effective Date, (ii) Taxes of Seller and any Affiliate of Seller (other than the Project Company) for any Tax period and (iii) Transfer Taxes paid by or assessed against Buyer that are not the responsibility of the Buyer; and

    e.   **any fraud, intentional misrepresentation or willful misconduct by Seller or any other Affiliate of Seller in connection with the Transaction Documents or the Transactions.**

Id. at § 6.1 (emphasis added).

20.    The term "Loss(es)" is defined in the MIPA as including: "(a) the amount of any ***out-of-pocket loss, cost, expense, damage or Liability, including interest***, Taxes, fines disallowance or reduction of the ITC or Tax deductions and ***reasonable legal*** and accounting ***fees and expenses***; (b) all debts, liabilities and obligations owed to or at the behest of any other Person; and (c) all Actions, obligations, losses, damages, judgments, awards, penalties, fines, fees, assessments and settlements." Id. at § 1.1 (emphasis added).

21.    Further, given that Plaintiffs were contractually precluded by the LOI from communicating directly with JEA to confirm the veracity of GSPP's representations regarding its discussions and negotiations with JEA, Plaintiffs bargained for, and the MIPA contained, a representation from GHC III in Section 3.3 thereof that "[c]onsistent with the Transaction Documents, the Seller is unaware of the existence of any Material Adverse Effect." Id. at 3.33.

22.    The term "Material Adverse Effect" is defined in the MIPA as follows:

> "**Material Adverse Effect**" means **any change, occurrence, fact, event or development**, that has a material adverse effect on (a) the business, the Membership Interests, the assets, Liabilities, results of operation or condition (financial or otherwise) of the Seller, **the Project Company, or the Project**, (b) the ability of Seller to consummate the Transactions or **perform its obligations under this Agreement or any other Transaction Document to which Seller is or at Closing shall be a party** or (c) the Site Host's ability to perform its obligations under any Real Property Documents or

other Project Contracts to which the Site Host is party; or (d) **the ability of the Project Company to develop an operable and revenue producing Project.**

<u>Id</u>. at 1.1 (emphasis added).

23.     Plaintiffs insisted upon the inclusion of this "No Material Adverse Affect" language in the MIPA to avoid a situation where they purchased the Project only to learn after-the-fact that JEA – who Plaintiffs were contractually precluded from communicating with pursuant to the LOI – either did not have any interest in the Project/the energy resource generated therefrom or would not agree to the "Project Assumptions" stated in the LOI, and to provide Plaintiffs with recourse should that occur.

24.     Pursuant to Section 6.8(a) of the MIPA, "[a]ll representations and warranties shall survive for the periods set forth below: … all other representations and warranties made by Seller or Buyer, other than those referenced in clause (i) [regarding Tax Matters set forth in Section 3.18], **shall survive until the 12-month anniversary of the Effective Date**" (*i.e.*, December 23, 2025). <u>Id</u>. at 6.8(a) (emphasis added).

25.     In January of 2025, after the transaction had closed and the Plaintiffs were no longer contractually precluded from contacting JEA directly regarding the Project and the PPA, the Plaintiffs reached out to JEA, via both telephone and email, to discuss the terms of a finalized PPA and the steps necessary to connect the Project to the JEA distribution network so that the Plaintiffs would realize the benefit of their bargain with the Defendants.

26.     During a call held the week of January 20th, 2025, representatives of JEA advised representatives of the Plaintiffs that JEA had expressly advised GSPP in November 2024 – prior to execution of the MIPA – that it would not enter into a PPA for the Project based on the prospective terms included by GSPP in the LOI and eventually memorialized in the MIPA as

"project assumptions" and explicitly advised GSPP that the a PPA Rate of $49/MW was not a term JEA would agree to.

27.    These communications between JEA and GSPP occurred **prior** to the execution of the MIPA and during the time in which: (i) the Plaintiffs were precluded from contacting JEA regarding the PPA; and (ii) GSPP was obligated to keep the Plaintiffs up to date regarding its communications with JEA, specifically including information related to discussion/negotiation of the terms of the PPA.

28.    Thereafter, on January 27, 2025, in a response to a follow up email from the Plaintiffs, Rene Brown, an Electric Systems Engineer at JEA, who served as one of the point of contacts for the Project with JEA, stated via email that:

> Based on your email below, the pricing is unchanged for a 25 year term and an escalator is introduced beyond 25 years; is that correct? **As mentioned on our call, we shared feedback with the GSPP team that the $49 would likely not work, hence our request for quotes for a longer contract term (flat pricing preferred).**
>
> **Where we left off with GSPP in November was that they were to provide a draft PPA for our review along with updated quotes.**

See January 27, 2025, Email to Plaintiff attached hereto as Exhibit "3" (emphasis added).

29.    Thereafter, at a meeting with representatives of JEA during the first week of March 2025, representatives of JEA again reiterated to representatives of the Plaintiffs, including Scrivener, that Kreidler was specifically told in November 2024, that the PPA Rate of $49/MW would not be acceptable to JEA, that JEA would not permit the "gen-tie" line for the Project to enter JEA's easement, and that new resource planning was underway.

30.    Defendants were obligated to disclose to Plaintiffs what JEA had advised Defendants regarding the Project, both under the LOI and the MIPA.

31.    Defendants nevertheless breached their obligation under Section B of the LOI to

keep NextNRG apprised of Defendants' discussions/communications with JEA regarding the terms of the PPA Defendants and JEA were negotiating, at a time when Plaintiffs were contractually precluded from communicating directly with JEA to confirm the veracity of Defendants' representations about the status of their discussions/negotiations with JEA.

32.     Defendants then made knowingly false representations to Plaintiffs that (i) JEA was ready to move ahead with a PPA Rate of $49 per MW for energy and that JEA was also ready to include a "gen-tie" line in their easement(s) (*e.g.*, the same "Project Assumption" terms stated in Appendix A to the LOI) **after Defendants had been explicitly advised by JEA that those terms were not acceptable to JEA**, and (ii) Defendants were **unaware of the existence of any "Material Adverse Effect" with respect to their discussions/negotiations with JEA**, to induce Plaintiffs to enter into the MIPA and purchase the Project for millions of dollars.

33.     On or about June 4, 2025, Plaintiffs made demand upon the Defendants for payment, indemnification, and negotiation pursuant to the MIPA, however, the Defendants have refused to reimburse and/or indemnify the Plaintiffs or otherwise enter into good faith negotiations to resolve the dispute.

34.     All conditions precedent to the commencement and maintenance of this action have been performed by Plaintiffs, have otherwise occurred, or have been waived by the parties.

35.     As a consequence of Defendants' breach/default of the terms, conditions, covenants, agreements, representations and warranties made by Defendants in the LOI and MIPA, Defendants are obligated to indemnify Plaintiffs under Section 6.1 of the MIPA from and against any and all "Losses" incurred by Plaintiffs, including but not limited to returning the Purchase Price and Seller's Development Costs to Plaintiff and reimbursing Plaintiffs for the reasonable attorneys' fees and expenses incurred by them in pursuing this action, in addition to the other relief

sought herein.

## COUNT I
### (Breach of Contract – LOI)

36.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 35 as if set forth fully herein.

37.    NextNRG and its designee/affiliate NIH entered into the LOI with GSPP and its designee/affiliate GHC III.

38.    The LOI explicitly precluded NextNRG and its designee/affiliate NIH from contacting JEA directly about the Project and the prospective PPA and, consequently, required GSPP to keep NextNRG and its designee/affiliate NIH "up to date regarding all communications with JEA to specifically include information related to any PPA discussions."

39.    Defendants breached the LOI by failing to keep Plaintiffs up to date regarding its communications with JEA, including communications regarding the proposed terms of the PPA.

40.    Defendants breached the LOI by failing to advise the Plaintiffs that JEA informed the Defendants that the terms of the PPA presented in the LOI were not agreeable to JEA.

41.    Defendants also breached the LOI by failing to keep the Plaintiffs up to date regarding its communications with JEA relating to the use of any JEA easement or infrastructure that would allow for the Project to be connected to JEA's utility network, including "substation infrastructure."

42.    Plaintiffs have suffered damages due to Defendants' breaches.

## COUNT II
### (Breach of Contract - MIPA)

43.    NIH repeats and realleges the allegations set forth in paragraphs 1 through 42 as if set forth fully herein.

44.     NIH and GHC III entered into the MIPA whereby NIH agreed to pay GHC III the Purchase Price, including the Deposit paid pursuant to the LOI, and Seller's Development Costs, in the total amount of $4,100,000.00, to transfer 100% of the legal and beneficial voting and economic ownership interests in the Project Company, which owned the development rights to the Project. Ex. 1 at § 2.2.

45.     Pursuant to the MIPA, GHC III also agreed to indemnify, defend, reimburse, and hold harmless the Plaintiffs from all losses incurred by NIH and its affiliates, successors, and assigns as a result of, among other things:

a.  the breach of, or default under, any covenant or agreement of Seller contained in any Transaction Document; and

b.  any fraud, intentional misrepresentation or willful misconduct by Seller or any other Affiliate of Seller in connection with the Transaction Documents or the Transactions.

Id. at § 6.1.

46.     GHC III also represented that it was unaware of the existence of any Material Adverse Effect (Ex. 1 at 3.33), which was defined to include "**any change, occurrence, fact, event or development**, that has a material adverse effect on (a) … **the Project Company, or the Project**, (b) the ability of Seller to consummate the Transactions or **perform its obligations under this Agreement or any other Transaction Document to which Seller is or at Closing shall be a party** or … (d) **the ability of the Project Company to develop an operable and revenue producing Project**." Id. at 1.1 (emphasis added).

47.     NIH has made demand upon GHC III to indemnify and reimburse the Plaintiffs pursuant to the MIPA, as a result of GHC III's, and its affiliate/successor GSPP's, actions relating to the PPA and the existing JEA infrastructure to facilitate transmission from the Project to JEA, including substation infrastructure, including but not limited to:

   a.  Breaching and/or providing inaccurate representations or warranties in the Transaction Documents, including the LOI;

   b.  Breaching and/or defaulting, under covenants and agreements in the Transaction Documents, including the LOI; and

   c.  Fraud, intentional misrepresentation and/or willful misconduct Seller in connection with the Transaction Documents, including the LIO, and/or the Transactions.

48.  GHC III has breached the MIPA by failing to indemnify and reimburse the Plaintiffs pursuant to the MIPA as a result of these actions, representations, and inactions.

49.  GHC III has also breached the MIPA by agreeing that it was not aware of the existence of any Material Adverse Effect on the Project despite being informed that the PPA Rate of $49/MW would not be acceptable to JEA, that JEA would not permit the "gen-tie" line for the Project to enter JEA's easement, and that new resource planning was underway.

50.  NIH has been damaged by GHC III's breaches of the MIPA.

## COUNT III
### (Fraud in the Inducement)

51.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 50 as if set forth fully herein.

52.  Between September 2024 and December of 2024, Defendants made material misrepresentations to the Plaintiffs relating to the PPA and the existing JEA infrastructure to facilitate transmission from the Project to JEA, including substation infrastructure, including that:

   a.  The proposed PPA terms as represented to the Plaintiffs in the LOI and MIPA, including a PPA Rate of $49/MW, were potentially viable; and

   b.  That JEA had agreed to allow the Project access to JEA's easement(s) via a "gen-tie" line as necessary to facilitate transmission of electricity from the

Project to JEA such that substation infrastructure was available at the Project to the best of the Defendants' knowledge.

53.     Further, the Defendants omitted material information related to the Project, including JEA's refusal to agree to allow access to its easement for a "gen-tie" line to facilitate transmission of electricity generated from the Project to JEA and that JEA had advised the Defendants that the proposed terms of the PPA as represented by the "project assumptions" contained in the LOI and MIPA were not acceptable to JEA, particularly a PPA Rate of $49/MW.

54.     The Defendants knew or should have known these misrepresentations were false and that these omissions were material to the Plaintiff.

55.     The Defendants made these misrepresentations/omissions in order to induce the Plaintiffs to rely on them such that the Plaintiffs would continue to negotiate with the Defendants to purchase the rights to the Project and enter into the MIPA.

56.     The Plaintiffs did, in fact, rely upon these misrepresentations/omissions.

57.     The Plaintiffs did not know these representations were false and/or that material omissions were made by the Defendants.  In fact, the Plaintiffs were contractually precluded from communicating with JEA such that they could have ascertained such representations were false and/or that material omissions had been made by the Plaintiffs.

58.     As a direct and proximate result of the Plaintiffs' detrimental reliance on the fraudulent misrepresentations/omissions of the Defendants, Plaintiffs have suffered pecuniary damages in an amount to be determined at trial.

59.     The Defendants' actions were purposeful, with knowledge of the Plaintiffs' rights, and with the intention of interfering with those rights.

60.     The Defendants' actions were made in bad faith and were wanton, willful and malicious.

61.     Accordingly, punitive damages should therefore be awarded against the Defendants in addition to compensatory damages, in an amount no less than three times the amount of the Plaintiffs' compensatory damages.

## COUNT IV
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

62.     NIH repeats and realleges the allegations set forth in paragraphs 1 through 61 as if set forth fully herein.

63.     NIH and GHC III entered into the MIPA whereby NIH agreed to pay GHC III the Purchase Price, including the Deposit paid pursuant to the LOI, and Seller's Development Costs to transfer 100% of the legal and beneficial voting and economic ownership interests in the Project Company, which owned the development rights to the Project.

64.     Pursuant to the MIPA, the benefit of the bargain for NIH was acquiring "the development rights for a 74.9MWAC solar and BESS project located in Nassau County, Florida, for which the project assumptions are outlined in Exhibit D (the "**Project**")." Ex I at p. 1.

65.     However, as set forth above, GHC III, with and/or through its affiliate/successor GSPP, failed to advise the Plaintiffs that JEA had informed the Defendants prior to execution of the MIPA that the terms of the PPA presented in the LOI were not agreeable to JEA, despite such terms being included as "project assumptions" in the LOI and MIPA.

66.     GHC III, with and/or through its affiliate/successor GSPP, also failed to advise the Plaintiffs that no agreement to access JEA's easement or other infrastructure existed that would allow for the Project to be connected to JEA's utility network, including "substation

infrastructure", was available for the Project or that JEA had explicit advised GSPP that it would not agree to such access.

67.     By failing to inform the Plaintiffs of the foregoing, GHC III sought to withhold the benefit of the MIPA from NIH.

68.     GHC III, with and/or through its affiliate/successor GSPP, was aware that NIH and its affiliate/successor NextNRG were precluded from contacting JEA directly to obtain any confirmation or information as to whether the "project assumptions" were accurate or whether access to an easement or infrastructure that would allow for the Project to be connected to JEA's utility network, including "substation infrastructure", was available for the Project.

69.     Therefore, GHC III, through its conscious and deliberate actions, failed and/or refused to discharge its contractual responsibilities and unfairly frustrated the purpose of the MIPA and NIH's expectations thereunder

70.     As a direct and proximate result of said breach, NIH was damaged and demands and pecuniary damage suffered as a result thereof in an amount to be determined at trial.

71.     In addition, Plaintiff demands all costs, disbursements and reasonable attorneys' fees incurred as a result of GHC III's omissions relating to the Project and MIPA.

## COUNT V
### (Negligent Misrepresentation)

72.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 71 as if set forth fully herein.

73.     A special relationship existed between the Plaintiffs and the Defendants, as evidenced by the LOI, which specifically imposed a duty upon the Defendants to impart correct information regarding the Project upon the Plaintiff.

74.     Between September 2024 and December of 2024, Defendants made material misrepresentations to the Plaintiffs relating to the PPA and the existing JEA infrastructure to facilitate transmission from the Project to JEA, including substation infrastructure, including that:

      a.   The proposed PPA terms as represented to the Plaintiffs in the LOI and MIPA, including a PPA Rate of $49/MW, were potentially viable; and

      b.   That JEA had agreed to allow the Project access to JEA's easement(s) via a "gen-tie" line as necessary to facilitate transmission of electricity from the Project to JEA such that substation infrastructure was available at the Project to the best of the Defendants' knowledge.

75.     Further, the Defendants omitted material information related to the Project, including JEA's refusal to agree to allow access to its easement for a "gen-tie" line to facilitate transmission of electricity generated from the Project to JEA and that JEA had advised the Defendants that the proposed terms of the PPA as represented by the "project assumptions" contained in the LOI and MIPA were not acceptable to JEA, particularly a PPA Rate of $49/MW

76.     The Defendants knew or should have known these representations/omissions were false and were made with the intent of misleading Plaintiffs into relying upon said representations or omissions.

77.     The Plaintiffs did, in fact, rely upon these misrepresentations/omissions, as evidenced by Plaintiffs efforts to continue to negotiate with Defendants and thereafter entering into the MIPA, which included, among other things, assumptions regarding the PPA such as a PPA Rate of $49/MW.

78.    The Plaintiffs did not know these misrepresentations were false or that such omission occurred as they were precluded by the LOI from communicating directly with JEA and, as such, they could not have ascertained the same absent disclosure from Defendants.

79.    As a direct and proximate result of the Plaintiffs' detrimental reliance on these misrepresentations/omissions of the Defendants, Plaintiffs have suffered pecuniary damages in an amount to be determined at trial.

<u>**COUNT VI**</u>
**(Unjust Enrichment)**

80.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 79 as if set forth fully herein, with this claim being brought in the alternative to the contractual claims alleged against the Defendants.

81.    Plaintiffs provided a benefit to Defendants, to wit; the Deposit, the Purchase Price and the Seller's Development Costs, based upon the "project assumptions" and terms communicated by the Defendants to the Plaintiffs.

82.    Defendants' use of the benefit conferred by the Plaintiffs despite the Defendants being made aware that the "project assumptions" and terms communicated by the Defendants to the Plaintiffs were not viable constitutes an unjust enrichment to the Defendants.

83.    Under the circumstances the Defendants' retention of the benefit conferred by the Plaintiffs would be inequitable unless the Defendants repay the Plaintiffs the value of said benefit in full plus interest at the statutory rate.

84.    As a result of the unjust enrichment of Defendants, the Plaintiffs has been damaged and demands judgment against Defendants, jointly and severally, in the amount of Four Million One Hundred Thousand and 00/100 ($4,100,000.00).

## COUNT VII
### (Breach of Fiduciary Duty)

85.     Plaintiffs repeat and reallege paragraphs 1 through 84 as if fully set forth herein.

86.     Defendants owed fiduciary duties of care and to disclose to the Plaintiffs based upon the confidential fiduciary relationship created between them through the LOI and the terms contained therein.

87.     Specifically, the Plaintiffs reposed trust in the Defendants to keep the Plaintiffs update to date regarding their communications with JEA, the status of the negotiations of the PPA with JEA, the infrastructure to facilitate transmission from the Project to JEA, including substation infrastructure was available at the Project, and other information related to that Project that may have been relevant to the Plaintiffs' interests.

88.     Defendants accepted the trust and confidence reposed in them by Plaintiffs by undertaking negotiations with JEA in relation with the PPA, continuing to develop the Project during the pendency of their negotiations with the Plaintiffs, and preparing and executing the MIPA based upon this trust and confidence of the reposed in them by the Plaintiffs.

89.     However, the Defendants breached these fiduciary duties by: (a) making the misrepresentations set forth herein; (b) failing to inform the Plaintiffs regarding their communications with JEA; (c) failing to inform the Plaintiffs regarding the negotiations of the terms of the PPA with JEA, including failing to inform the Plaintiffs that JEA the Defendants that the "project assumptions" based upon proposed PPA terms were not acceptable to JEA; and (d) failing to inform the Plaintiffs that JEA informed the Defendants that the Project could not utilize access to JEA's easement(s) and infrastructure necessary to facilitate transmission from the Project to JEA as contemplated by the parties, such that substation infrastructure was not available at the Project.

90.     As a direct result of these breaches of fiduciary duty, Plaintiffs have been damaged.

## COUNT VIII
### (Recission)

91.     Plaintiffs repeat and reallege paragraphs 1 through 90 as if fully set forth herein.

92.     The Defendants completely failed to keep the Plaintiffs up to date regarding the negotiations of the PPA with JEA, its communications with JEA, including communications regarding the proposed terms of the PPA, regarding its communications with JEA relating to the use of JEA's easement(s) for a "gen-tie" line or other infrastructure that would allow for the Project to be connected to JEA's utility network, including "substation infrastructure", among other obligations.

93.     As a result of the foregoing, and the JEA's communications to the Plaintiffs that no PPA would be agreed to based upon the "project assumptions" outlined in the LOI and MIPA and that no easement or infrastructure existed that would allow for the Project to be connected to JEA's utility network, including "substation infrastructure", the MIPA was induced by fraud, rending it unenforceable by the Defendants.

94.     The Defendants also failed to indemnify and reimburse the Plaintiffs pursuant to the MIPA as a result of the Defendants actions, representations, and inactions, including but not limited to:

    a.  Breaching and/or providing inaccurate representations or warranties in the Transaction Documents, including the LOI;

    b.  Breaching and/or defaulting, under covenants and agreements in the Transaction Documents, including the LOI; and

    c.  Fraud, intentional misrepresentation and/or willful misconduct Seller in connection with the Transaction Documents, including the LIO, and/or the Transactions.

Id. at § 6.1 (emphasis added).

95.     The Defendants also agreed that they were not aware of the existence of any Material Adverse Effect on the Project despite being informed that the PPA Rate of $49/MW would not be acceptable to JEA, that JEA would not permit the "gen-tie" line for the Project to enter JEA's easement, and that new resource planning was underway.

96.     As a result of these breaches by the Defendants, Plaintiffs have suffered, amongst other things:

> a.   Lost the potential investments in the Project;
>
> b.   Lost reputational value and good will from their investors;
>
> c.   Additional financing costs as a result of extended negotiations for a PPA with JEA; and
>
> d.   Deprivation of the benefit of their bargain underlying the LOI and MIPA.

97.     As a result of Plaintiffs' damages, including, but not limited to the foregoing damages set forth in ¶96, money damages are inadequate to make Plaintiffs whole.

98.     Rescinding the MIPA and LOI and returning the monies paid by Plaintiffs will actually be effective in putting the parties back into roughly the same position they were in before their agreements and the status quo restored.

99.     In this instance, the parties can be restored to their original positions simply by the return of the Deposit, Purchase Price, and Seller's Development Costs paid by NIH.

**WHEREFORE**, Plaintiffs, NEXT/INGLE HOLDINGS, LLC, and NEXTNRG OPS, LLC, f/k/a NEXTNRG, LLC, respectfully request judgment in their favor, as follows:

A. As to Count I, a Judgment against Defendants, GSPP HOLDCO III, LLC and GREEN STREET POWER PARTNERS, LLC, jointly and severally, in an amount to be determined at trial, including but not limited to interest, attorneys' fees, and costs;

B. As to Count II, a Judgment against Defendant, GSPP HOLDCO III, LLC, in an amount to be determined at trial, including but not limited to interest, attorneys' fees, and costs;

C. As to Count III, a Judgment against Defendants, GSPP HOLDCO III, LLC and GREEN STREET POWER PARTNERS, LLC, jointly and severally, in an amount to be determined at trial but in a sum no less than Four Million One Hundred Thousand and 00/100 ($4,100,000.00), plus interest, attorneys' fees and costs, and an award of punitive damages;

D. As to Count IV, a Judgment against Defendant, GSPP HOLDCO III, LLC, in an amount to be determined at trial, including but not limited to interest, attorneys' fees, and costs;

E. As to Count V, a Judgment against Defendants, GSPP HOLDCO III, LLC and GREEN STREET POWER PARTNERS, LLC, jointly and severally, in an amount to be determined at trial but in a sum no less than Four Million One Hundred Thousand and 00/100 ($4,100,000.00), plus interest, and attorneys' fees and costs;

F. As to Count VI, a Judgment against Defendants, GSPP HOLDCO III, LLC and GREEN STREET POWER PARTNERS, LLC, jointly and severally, in an amount to be determined at trial but in a sum no less than Four Million One Hundred Thousand and 00/100 ($4,100,000.00), plus interest, and attorneys' fees and costs;

G. As to Count VII, a Judgment against Defendants, GSPP HOLDCO III, LLC and GREEN STREET POWER PARTNERS, LLC, jointly and severally, in an amount to be determined at trial, including but not limited to interest, attorneys' fees, and costs;

H.  As to Count VII, a Judgment against Defendants, GSPP HOLDCO III, LLC and

GREEN STREET POWER PARTNERS, LLC and the issuance of an order of Recission to place

the parties back in their original positions, plus interest, attorneys' fees, and costs; and

I.  Any such other and further relief that this Court deems just and proper

Dated: November 25, 2025

| HAYNES AND BOONE LLP | THE BERNSTEIN LAW FIRM |
|---|---|
| *Co-Counsel for Plaintiffs* | *Co-Counsel for Plaintiffs* |
| 30 Rockefeller Plaza | 10800 Biscayne Boulevard, Suite 950 |
| 22nd Floor | Miami, Florida 33161 |
| New York, NY 10112 | Tel. (305) 672-9544 |
| T +1 212.659.7300 | Fax (305) 672-4572 |
| F +1 212.918.8989 | Email: michael@blfmiami.com |
| Email: brian.matthews@haynesboone.com | Email: matthew@blfmiami.com |
| justin.bonanno@haynesboone.com | Email: assistant@blfmiami.com |
| | |
| */s/ Brian P. Matthews* | */s/ Michael I. Bernstein* |
| **Brian P. Matthews** | **Michael I. Bernstein** |
| Attorney Bar Code No. BM-0244 | Florida Bar No. 546208 |
| | |
| **Justin R. Bonanno** | |
| Attorney Bar Code No. JB-3034 | |